**SONAT EXPLORATION COMPANY, etc., Plaintiff-Appellant,**

v.

**William D. MANN and Mann Production, Inc., Defendants-Appellees.**

**No. 84–4845.**

United States Court of Appeals, Fifth Circuit.

March 14, 1986.

Jefferson D. Stewart, Grunini, Grantham, Grower & Hewes, James A. Keith, Jackson, Miss., for plaintiff-appellant.

Michael Hartung, Moore, Royals & Hartung, Jackson, Miss., for defendants-appellees.

Before WISDOM, POLITZ and TATE, Circuit Judges.

POLITZ, Circuit Judge:

In this diversity jurisdiction case, we must determine the legal effect, under Mississippi law, of the execution of an AFE ("Authorization for Expenditure") by a non-operator who was not party to the operating agreement covering the subject exploratory gas well. The district court concluded that neither the AFEs signed by the defendants nor their conduct obligated them to pay the drilling costs demanded by Sonat Exploration Company. For the reasons assigned, we affirm.

### Facts

In the summer of 1977, Sonat, Texas Crude, Inc., and Stone Oil Corporation entered into a field-wide operating agreement, reflecting their plans for the exploration and development of minerals in West Sandy Hook, a field which straddled the line between Louisiana and Mississippi. Each party to the operating agreement accepted responsibility for one-third of the exploration and development costs. Sonat was designated the operator.

In 1980 William D. Mann, an oil and gas investor, purchased acreage within the West Sandy Hook area. He subsequently sold a portion to Gus and Jonelle Primos, reserving a 0.3710940 percent mineral interest. At Sonat's request, Mann and Primos committed their acreage "for the purpose of the formation of an Exploratory Unit" by the Mississippi Oil and Gas Board. A 640-acre gas drilling unit was established.

In June of 1981, Primos assigned a 0.3125 percent working interest in the drilling unit to Mann Production, Inc. (hereafter, with Mann individually, collectively referred to as "Mann").

In 1981 Sonat drilled, completed, and sidetracked an exploratory gas well, identified as Forbes No. 2 Well, at a total cost of $7,292,708.12. Sonat attributed $27,216 to Mann's individual interest and $22,486 to his corporation's interest. No part of these costs has been paid.

Neither Mann nor Primos were asked to sign either the operating agreement or any other instrument ratifying or adopting that agreement. Mann individually signed three AFEs, dated February 9, 1981, September 21, 1981, and October 19, 1981. As president of Mann Production, Inc., he signed one AFE dated October 19, 1981. These four AFEs contained the estimates of various expenses to drill, complete, and sidetrack Forbes No. 2 Well. In each AFE, the words "Accepted and Agreed" appeared immediately above Mann's signature. Each AFE contained a breakdown by category of expense and apportioned the estimated total cost to an attached list of working interest owners. The September AFE packet indicated that an 11.4843750 working interest owner opted not to participate further. The suggestion that the expenses attributable to this "non-consenting" interest were apportioned prorata to the other working interest owners is not supported by the attachments to the AFEs.

Sonat's assistant vice president for drilling and production usually tried to get all interest owners to sign an operating agree-

ment. If they were unsuccessful in this effort, but the working interest owner subsequently signed an AFE, Sonat's representative testified that Sonat simply would treat that owner as a party to the operating agreement.

Periodically during the drilling activity Sonat sent Mann drilling reports, invoices, and billing statements. After the well was abandoned, Mann received a bill, in response to which he wrote Sonat "relative to our outstanding balance with your Company," and raised over 30 questions about the billing, requested a copy of the operating agreement and the signature page to that agreement, and concluded by saying that after receipt of the requested information "we will make disposition of this outstanding balance." Mann ultimately declined to pay and this litigation ensued. The district court dismissed Sonat's complaint, finding that Sonat: (1) had not sustained its burden of proving that Mann had undertaken in writing to pay a portion of the costs of drilling Forbes No. 2 Well; (2) had not demonstrated an industry custom or practice which would bind the signer of an AFE, who had not signed or ratified an operating agreement, to pay the estimated costs; and (3) had not shown detrimental reliance, even though Mann's conduct was adjudged "misleading."

### Analysis

Sonat maintains that the trial court was incorrect in its legal assessment of the AFEs under Mississippi law and in its finding of no detrimental reliance. Sonat first argues that an AFE, standing alone, constitutes a binding promise to pay a stated share of drilling and completion costs. No supporting authority was furnished to the trial court and our attention has been invited to none.

Our research discloses no authority for the proposition that an AFE is enforceable against one who has not signed an accompanying operating agreement. The case cited by appellant, *M & T, Inc. v. Fuel Resources Development Co.*, 518 F.Supp. 285 (D.Colo.1981), involved an AFE issued pursuant to a valid operating agreement between the parties. The cited secondary authority, Young, *Oil and Gas Operating Agreements: Producers 88 Operating Agreements, Selected Problems and Suggested Solutions*, 20 Rocky Mtn. Min.L. Inst. 197, 203–08 (1975), addresses the AFE only in the context of a coexisting operating agreement. We find no case in which the signer of an AFE has been held liable solely because of the execution of the AFE. We find no secondary authority espousing such a result.[1]

Finding no dispositive Mississippi statutory or jurisprudential authority, we must, as an *Erie* court, "reach the decision that we think [the forum] state court would reach." *Dipascal v. New York Life Ins. Co.*, 749 F.2d 255, 260 (5th Cir.1985). In doing so we are to "decide ... the issue as we believe a Mississippi court would decide it." *Green v. Amerada-Hess Corp.*, 612 F.2d 212, 214 (5th Cir.), *cert. denied*, 449 U.S. 952, 101 S.Ct. 356, 66 L.Ed.2d 216 (1980). It is our task to "predict the course of the Mississippi Supreme Court ... [presuming] 'that the Mississippi courts would adopt the prevailing rule if called upon to do so.'" *Turbo Trucking Co. v. Underwriters at Lloyd's*, 776 F.2d 527, 529 (5th Cir.1985) (*quoting Hensley v. E.R. Carpenter Co.*, 633 F.2d 1106, 1109 (5th Cir.1980)). In making our *Erie* prediction, we are largely guided by the conclusions of the trial judge, "schooled and skilled in the law of his state." *Turbo Trucking Co.*, 776 F.2d at 529.

The Authorization for Expenditure form utilized by Sonat contains no language which may be taken as a promise by Mann to pay a part of the reflected costs. Neither attached sheet, one a breakdown of the cost estimate and the other a listing of working interest owners with a cost appor-

---

**1.** We have been cited to no authority which would permit a contract involving mineral development, such as is here presented, to be oral. We tend to the conclusion that the Mississippi Supreme Court would require that contracts involving oil and gas development be reduced to writing. *See generally Bell v. Hill Bros. Const. Co., Inc.*, 419 So.2d 575 (Miss.1982).

tionment, contains language that may be so considered. The district court's conclusion that the AFEs filed in evidence do not constitute a promise to pay is manifestly correct.

The trial judge also found that neither party offered satisfactory evidence of a binding industry custom or practice involving the signing of an AFE by the owner of a working interest who had not signed or ratified the pertinent operating agreement. We come to the same conclusion after a studied perusal of the record. If there indeed is an industry custom or practice, it is not reflected in the evidence now before the court. If it was Sonat's intention to rely, in whole or in part, on a custom or practice followed in the oil industry, it did not acquit its burden of proof as to that custom or practice.

*Contractual Ambiguity and Extrinsic Evidence*

Under Mississippi law, custom and usage may be used to interpret a vague or ambiguous contract. *O.J. Stanton & Co. v. Mississippi State Hwy. Comm'n,* 370 So.2d 909 (Miss.1979). But they may not be used to create a contract. *Firemen's Fund Ins. Co. v. Williams,* 170 Miss. 199, 154 So. 545 (1934). The existence of a clear and valid contract between the parties necessitates the exclusion of evidence of custom and usage. *Magnolia Lumber Corp. v. Czerwiec Lumber Co.,* 207 Miss. 738, 43 So.2d 204 (1949). Also, parol evidence may not be used in the interpretation of an unambiguous contract. *Noble v. Logan-Dees Chevrolet-Buick, Inc.,* 293 So.2d 14 (Miss. 1974).

The AFEs were offered in evidence as the factual basis for Sonat's contention that Mann contracted to pay a portion of the drilling, completion, and sidetrack expenses. The AFEs are not ambiguous. To the contrary, they are quite specific. Arguably, one could suggest that the "Accepted and Agreed" entry is a modicum of written evidence of a promise to pay. Accepting such *arguendo,* parol evidence would avail appellant naught. Sonat's vice president stated that Sonat generally tried to make all working interest owners parties to the operating agreement. This suggests the imperative of the operating agreement. An expert's testimony lent support to the argument that an AFE is only binding if appended to an operating agreement. We have come to that conclusion after reviewing the few cases involving AFEs and some of the literature on the subject. We agree with the passing reference of our Tenth Circuit colleagues in *Cleverock Energy Corp. v. Trepel,* 609 F.2d 1358, 1360 (10th Cir.1979), that an AFE is merely "an estimate of costs without binding effect in the industry."

■ We are persuaded that the AFEs at bar do not, on their faces, create a legally binding obligation of Mann to pay a share of the drilling, completion, and sidetrack expenses incurred by Sonat.

Sonat's second contention is that the trial judge erred in failing to rule that Mann Production, Inc. was liable for all expenses attributable to the interest acquired from Gus and Jonelle Primos. There is no merit to this contention. Mann could not have a greater obligation to pay than Primos. The Primos and Mann positions were identical. Neither signed nor ratified the operating agreement. The AFEs did not create binding obligations for either.

*Detrimental Reliance*

■ The final issue raised on appeal in that the trial court erred in finding that Sonat suffered no detriment as a consequence of Mann's misrepresentations. We find no detrimental reliance. Mann's misrepresentations did not cause Sonat to do anything it would not otherwise have done, particularly the things done because required by the agreement. Sonat's vice president in charge of drilling was precise and certain. Sonat would have followed the exact same course of activity whether Mann committed his less than 2% interest or declined to do so. Further, the suggestion that Sonat might have shifted the portion of costs attributed to Mann before the well was abandoned but could not do so afterwards is simply not persuasive.

For the foregoing reasons, the judgment of the district court is AFFIRMED.